UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RALF KELLER,                                           Case No. 2:19-cv-00011

             Plaintiff,                                Hon.  Maarten Vermaat
                                                       U.S. Magistrate Judge

      v.

CHIPPEWA COUNTY BOARD
OF COMMISSIONERS, et al.,

             Defendants.

_____/

## OPINION

### I.  Introduction

Plaintiff Ralf Keller filed this action against the Chippewa County Board of Commissioners and the Chippewa County Sheriff's Department on January 16, 2019. Keller suffers from stage four chronic obstructive pulmonary disease (COPD) and has had part of his left leg amputated.   Keller was arrested on an outstanding warrant the night of January 15, 2016, and booked into the Chippewa County jail around 3:00 A.M. the next morning.   When arrested, Keller was carrying three prescribed inhalers to treat his COPD and wearing a prosthetic leg.   He remained in the jail for three days.   The Deputy Sheriff who booked Keller into the jail seized his prosthetic leg and the three inhalers.   These seizures were made pursuant to jail policy.

Keller alleges that Defendants violated his rights under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq*., and Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794, *et seq*.   He alleges that Defendants

intentionally discriminated against him due to his disabilities and failed to provide reasonable accommodations.

Defendants have moved for summary judgment.   (ECF No. 71.)   As an initial matter, Defendants assert that Keller's claim against the Sheriff's Department should be dismissed because the Sheriff's Department is not a legal entity that may be sued.   Defendants argue that there are no genuine issues of material fact as to Keller's ADA and RA claims because the undisputed facts show (1) that Keller has not shown that he was not denied any program, service, or activity that the jail offers inmates, (2) that Keller has not shown intentional discrimination, (3) that Defendants had legitimate, non-discriminatory reasons for seizing Keller's prosthetic leg and inhalers, and (4) that Defendants provided reasonable accommodations to address Keller's disabilities.

Keller does not dispute the facts as asserted by Defendants, but argues that Defendants reach the wrong legal conclusions.   He says that Defendants' actions show that they discriminated against him due to his disabilities and that Defendants failed to provide reasonable accommodations.   (ECF No. 74.)

Defendants have filed a reply.   (ECF No. 75.)

On June 10, 2020, the Court held a hearing on Defendants' motion for summary judgment.   (ECF No. 81.)

After the hearing, Keller filed a post hearing supplemental response.   (ECF No. 83.)

After reviewing the briefs, arguments, and exhibits provided by the parties,

the Court respectfully concludes that dismissal of this case is appropriate.   The evidence before the Court fails to show a genuine issue of material fact as to Keller's ADA and RA claims.     Thus, Defendants' motion for summary judgment is GRANTED and this case is DISMISSED.

## II.   FACTS

### A.  Facts Not in Dispute

The facts of this case are generally undisputed.

Keller was arrested on an outstanding warrant around 11:00 P.M. on January 15, 2016.    (ECF No. 71-2, PageID.373 (jail incident report); ECF No. 71-17, PageID.488-89 (deposition of Keller).)    Special Deputy Shentele Apps began booking Keller into the Chippewa County Correctional Facility (CCCF or "the jail") at 3:27 A.M. on January 16, 2016.    (ECF No. 71-2, PageID.373.)

According to Keller's pulmonologist – Dr. Sethi – Keller suffers from stage four COPD.    (ECF No. 71-19, PageID.507, 508, 511.)    Dr. Sethi noted that stage four COPD is the final stage and the most severe.    (*Id*., PageID.511.)    According to Dr. Sethi, Keller was an active smoker at the time of the events in this case.    (*Id*.)    Dr. Sethi testified that he has advised Keller to stop smoking.    (*Id*.)    Dr. Sethi was also aware that Keller smoked marijuana, and he has advised Keller to stop this practice as well.    (*Id*., PageID.512.)

When booked, Keller had in his possession three inhalers containing medications to treat his COPD.    These medications were Proair, Symbicort and Tudorza.    (ECF No. 71-2, PageID.373.)    Proair is a rescue inhaler.    Symbicort and

Tudorza are long-acting medications.   (ECF No. 71-19, PageID.513.)   Deputy Apps took custody of these inhalers.   (ECF No. 71-2, PageID.373.)

Apps noted that Keller did not have the original prescription boxes for these medications with directions.   (*Id.*)   Accordingly, she called Dr. Dood, the jail's contract physician, to determine the correct dosages.   (*Id.*)   Dr. Dood informed Apps that Keller should receive Proair four times per day as needed, Symbicort two times per day, and Tudorza one time per day.   (*Id.*)

A portion of Apps's jail incident report regarding her contact with Dr. Dood is shown below.

INCIDENT DETAILS

On above date and approximate time, U/O began the intial book-in process with Ralph Keller. Keller brought three inhalers with him which were a Proair inhaler, a Symbicort inhaler, and a Tudorza Pressair inhaler. Dr. Dood was advised of the three inhalers and approved all three. Dr. Dood also advised the appropriate dosage for the inhalers, as they did not come in the original prescription box with directions. Dr. Dood advised the Proair for 4x daily as needed, the Symbicort 2x daily, and the Tudorza Pressair once daily.

IMMEDIATE OFFICER ACTIONS

- Accepted inhalers
- Called Dr. Dood
- Set up personal med sheet
- Placed inhalers in C side topical bin
- Placed report and Medication verification sheet in Book-in cabinet

(*Id.*)

During the booking process, Apps asked Keller a number of questions about his health.   She filled out jail forms documenting his responses.   (*See* ECF No. 71-4 (inmate questionnaire); ECF No. 71-5 (jail medical comments); ECF No. 71-6 (medical screening report); and ECF No. 71-7 (inmate alcohol/drug usage questionnaire).) Keller reported that he had a sore on his left leg, a sore throat, and a hip issue.   Apps

documented all of these issues.   (ECF No. 71-4, PageID.378.)   Keller also reported that he smoked three to four marijuana "joints" daily and that had last used marijuana at 9 P.M. on January 15, 2016.   (ECF No. 71-7, PageID.385.)

Apps secured the inhalers because inmates are prohibited from keeping medications in their cells due to the potential for overdose and sharing medication with other inmates.   (ECF No. 71-1, PageID.366 (affidavit of Lt. Stanaway).)

As noted in the medical screening report, Deputy Apps learned that Keller had a prosthetic left leg.   (ECF No. 71-6, PageID.383.)   An image of a prosthetic leg that Keller had at the time of his deposition in 2019 is shown below.



(ECF No. 71-18.)   In his deposition, Keller noted that the prosthetic leg shown above

is similar to the prosthetic leg he had in 2016 in that both legs were made from hard

plastic and metal, and weighed 10 to 15 pounds.   (ECF No. 71-17, PageID.485-86.)

Keller also said that he takes off this leg four to six times per day.   (*Id*., PageID.484.)

        As soon as Keller finished booking, he had to turn over his prosthetic left leg.

(ECF No. 71-17, PageID.491.)   The prosthetic leg is listed in the inventory of

property taken from Keller.   (ECF No. 71-8.)   Lt. Stanaway explained that Keller's

leg was taken because "Plaintiff had a sore on his left leg and the prosthetic could be

used as a weapon to harm others."   (ECF No. 71-1, PageID.367.)   Lt. Stanaway also stated that it was jail policy to confiscate the prosthetic leg.   (*Id.*)

After booking, Keller was taken by wheelchair to holding cell H-1 in the jail. (*Id.*)   Two other inmates were in holding cell H-1 at the time.   (*Id.*, PageID.367-68.) Holding cell H-1 is located near the jail's control room and is equipped with a toilet, bench, sink, water, access to an intercom system that a prisoner may use to speak to staff, and a telephone.   (*Id.*, PageID.368.)

Keller acknowledges that he was taken by wheelchair to the doorway of the holding cell.   (ECF No. 71-17, PageID.492.)   He also said that he asked jail staff how he would get around, and they said he should "hop or crawl."   (*Id.*)   In the cell, Keller "scooted along with [his] one leg" while holding the wall.   (*Id.*)

Keller said the holding cell had one bench, and he said the bathroom was "right there."   (*Id.*, PageID.493.)   Keller said that he was able to use the sink and toilet in the holding cell.   (*Id.*, PageID.492-93.)   He also said he "shuffled" to get to the sink and toilet.   (*Id.*, PageID.493.)

Meals were hand-delivered to Keller in this cell.   (*Id.*, PageID.493.)   Other inmates also helped deliver food to Keller.   (*Id.*, PageID.494.)

Keller did not shower during his three days in the jail.   (*Id.*, PageID.493.)

Keller said that a Deputy took him to the recreation area by wheelchair.   (*Id.*, PageID.494.)   Keller said that when he was transported by wheelchair, he was able to get himself into the wheelchair without assistance.   (*Id.*)

- 7 -

Keller does not allege that he did not receive his prescribed medications on the schedule approved by Dr. Dood.   The jail's medication administration record (ECF No. 71-16), although incomplete, shows regular administration of Keller's medications.   Keller, nevertheless, experienced a number of breathing problems during his time in the jail.   The jail incident report from January 17, 2016 is shown below.

```
      DATE     TIME     REQUESTED    CHIPPEWA COUNTY SHERIFF        PAGE    1  JBS338
    1/17/16 16:03:51  RUDYH            JAIL INCIDENT REPORT

  INCIDENT #:     8340-16          INCIDENT DATE: 1/17/16       INCIDENT TIME: 13:57

  VIOLATION :  36 AFTER HOURS CONSULT WITH JAIL DR       CLASS: MIN

  REPORTED BY      515 HYVARINEN, RUDY


  OFFENDER

  KELLER, RALPH GEORGE           LEMS ID:    15830       LOCAL ID: A0000233180F
  036 AFTER HOURS CONSULT WITH  CLASS: MIN  CELL:  1    H1       ENTERED JAIL: 1

  INCIDENT DETAILS

       On 01/17/16 inmate Kellar, Ralph complained he can't catch his breath.
       Deputy Robinson had given his ProAir inhaler to Keller at 0930 hrs
       and 1341 hrs and it hasn't helped. Cpl Spencer asked me Deputy
       Hyvarinen to call and advise Dr Dood of Kellers breathing issues.
       Dr Dood advised to give Keller medication Prednisone 20 mg once daily.
       Deputy Robinson did give Keller perdnisone 20 mg for today.

       At 1530 hrs Keller complained to control through emergency button in
       O-2 that he was having breathing trouble again. Deputy Stark went to
       O-2 and asessed Keller and advised Cpl Spencer and me of Keller's
       diffuculty breathing. Cpl Spencer had me call Dr Dood and advise him
       Keller. Dr Dood said give him two puffs of his pro-air and give a
       nebulizer treatment and check his oxygen level and temperature.
       Dr Dood said Keller is not tobe sent to hospital unlees he is turning
       blue or discolored and temperature ir low. Kellers pulse ox level was
       96 and temperature was 98.1. Cpl Spencer gave nebulizer treatment in
       medical exam room and after treatment Keller was breathing rormally
       and said felt much better.

  REPORTING OFFICER 1    :                           DATE: 1-17-16
                         515 SPECIAL DEPUTY RUDY HYVARINEN

  CORRECTIONS SUPERVISOR :                           DATE:
```

(ECF No. 71-14.)

Lt. Stanaway provided a summary of what happened in his affidavit.   He attested that Keller attempted to make a 9-1-1 call due to breathing difficulties on

- 8 -

January 17.  (ECF No. 71-1, PageID.369.)   He was given Ventolin[1] by an officer.  (*Id*.)   Later that day, Keller used the jail intercom system to complain that he was having difficulty breathing.   (*Id*.)   Deputy Robinson responded and gave him Proair at 9:30 A.M. and at 1:41 P.M.   (*Id*.)

Deputy Hyvarinen contacted Dr. Dood, who authorized 20mg of Prednisone daily.   (*Id*.)   Keller used the emergency button at 3:30 P.M. and complained to a deputy that he was having breathing problems.   (*Id*.)   Deputy Stark contacted Dr. Dood, who authorized two puffs of Proair and a nebulizer treatment.   (*Id*.)   Keller received the nebulizer treatment in the jail's medical room.   (ECF No. 71-17, PageID.496.)   He was transported there by wheelchair.   (*Id*.)   Dr. Dood also directed the Deputy to check Keller's oxygen level and temperature.   (ECF No. 71-1, PageID.369.)   Dr. Dood also instructed the Deputy to take Keller to the hospital if he was turning blue, was discolored, or if his temperature was low.   (*Id*.)   After Keller received the Proair and nebulizer treatment, he reported he was feeling better.  (*Id*., PageID.370.)

On January 17, 2016, Keller was moved to observation cell O-2 and remained in that cell until his release on January 19.   (*Id*., PageID.367.)   Keller said that the observation cell was smaller than the holding cell.   (ECF No. 71-17, PageID.495.)

On January 18, 2016, Keller again had breathing difficulties.   The medical incident report from that day is shown below.

---

[1]     Dr. Sethi, Keller's pulmonologist, testified that Proair and Ventolin are both bronchodilators that provide quick, short-term relief when a person experiences breathing difficulties.   (ECF No. 71-19, PageID.513.)

```
DATE      TIME    REQUESTED      CHIPPEWA COUNTY SHERIFF           PAGE    1  JBS338
1/18/16 01:58:54   CODY                 JAIL INCIDENT REPORT

INCIDENT #:   8341-16          INCIDENT DATE: 1/17/16       INCIDENT TIME: 20:30

VIOLATION : 36 AFTER HOURS CONSULT WITH JAIL DR      CLASS: MIN

REPORTED BY    584 MAYER, CODY
```

---

```
OFFENDER

KELLER, RALPH GEORGE          LEMS ID:   15830         LOCAL ID: A0000233180F
036 AFTER HOURS CONSULT WITH  CLASS: MIN  CELL: 1    O2       ENTERED JAIL: 1
```

```
INCIDENT DETAILS
      On the above date at approx time U/O called Dr. Dood with CHC. U/O
      did this due to inmate Keller, Ralph George DOB: 12/02/60 pressing
      the emergency button and stating he was having a hard time breathing.
      Dr. Dood said to have Keller relax and to rest. Dr. Dood said if any
      other problem came up to call him back.
```

```
IMMEDIATE OFFICER ACTIONS
      called Dr. Dood.
```

```
REPORTING OFFICER RECOMMENDATION
      Medical to review.

REPORTING OFFICER 1                               DATE: 1/18/16
                     584 DEPUTY CODY MAYER

CORRECTIONS SUPERVISOR : _____    DATE: _____
```

(ECF No. 71-15.)

Lt. Stanaway also summarized the events of January 18.   He noted that Keller used the emergency button in the observation cell at 1:58 A.M. to complain that he was having difficulty breathing.   (ECF No. 71-1, PageID.370.)   Deputy Mayer contacted Dr. Dood.   Dr. Dood indicated that Mayer needed to instruct Keller to relax and rest.   (*Id.*)   Deputy Mayer requested a jail medical follow-up review. (*Id.*)

Nurse Lightfoot performed a health assessment that morning at 10:45 A.M. (*See* ECF No. 71-10 (Correctional Health Companies (CHC) records).)   She noted that Keller coughs when his breathing is difficult and that he reportedly is a heavy smoker of both marijuana and tobacco.   (ECF No. 71-1, PageID.370.)

- 10 -

After his release from CCCF, Keller went to the local hospital for continued treatment.   (ECF No. 71-17, PageID.502.)

**B.  Potentially Relevant Evidence Not Addressed in the Record**

The evidence provided by the parties did not address whether either of the cells in which Keller was held complied with the requirements of the ADA.   Keller provided a 217-page document entitled "American with Disabilities Act Title II Regulations."   (ECF No. 74-2.)   He did not provide analysis of the facts of the case in light of these regulations.

In addition, Keller did not provide information regarding the layout of either of the cells in which he was held.   According to the Defendants' expert, holding cell H-1 was 20 feet by 20 feet in size.   (ECF No. 71-12, PageID.407.)   Keller testified that the observation cell was smaller than the holding cell.   (ECF No. 71-17, PageID.495.)   Although Keller stated that he shuffled or scooted to the toilet and sink in holding cell H-1 (ECF No. 71-17, PageID.492-93), he did not state how far he had to shuffle or scoot.   Keller also gave no indication of how he transported himself in observation cell O-2, where he was held from January 17 to January 19, 2016. Furthermore, the record does not indicate whether the cells were equipped with handrails or handholds.

**C. Opinion Evidence**

Defendants' expert – Darrell L. Ross, PhD. – opined that the jail followed accepted booking protocols.   (ECF No. 71-12, PageID.407.)   More specifically, Dr. Ross concluded that the seizure of Keller's prosthetic leg was appropriate for security

reasons.   (*Id.*, PageID.410.)   His opinion on this point is shown below.

> Third, it was appropriate and reasonable to confiscate Mr. Keller's prosthetic leg and it was done
> for security purposes. From a review of the photo of Mr. Keller wearing the prosthetic (Exhibit
> #1, Keller Dep.) it showed that the components are hard plastic combined with metal. Mr. Keller
> testified in his deposition that the prosthetic was made of hard plastic and metal and weighed
> about 10 to 15 pounds (Dep. Pgs. 41-42). The durable materials of the prosthetic are capable of
> supporting Mr. Keller's weight. Based on its design it was also capable of serving as a weapon
> which could inflict harm and injury on other detainees and supervising deputies. Given that the
> prosthetic leg had the potential of causing harm to others as a dangerous weapon, deputy Apps'
> decision to confiscate it was appropriate. The decision to confiscate the prosthetic was not made
> to punish Mr. Keller or taken for vindictive purposes but rather for legitimate detention safety and
> security objectives to ensure the safety of the facility.

(*Id.*)

Dr. Ross also opined that the jail provided a reasonable accommodation to

address Keller's physical disability. That opinion is shown below.

> Fourth, the detention deputies provided an accommodation for Mr. Keller after confiscating his
> prosthetic. After the completion of the booking process Mr. Keller testified that he was placed in
> a wheelchair and wheeled him to H-1 holding cell by a deputy (Dep. Pg. 66). Holding cell H-1 is
> a large multiple-detainee cell (about 20 x 20 foot). The cell comprised: a toilet, bench, sink with
> water, access to a phone, and an intercom system in which detainees may speak with detention
> deputies. The cell is near the deputies control center. During the time that Mr. Keller was housed
> in H-1, there were two other younger detainees also housed in the cell. Mr. Keller testified that he
> received his meals and ate in the cell which were brought to the cell by the deputies, that he
> received a cup so that he could drink warm water due to his COPD, and also had juice or milk
> with his lunch (Dep. Pgs. 72-73). Mr. Keller testified that he was able to use the facilities while
> housed in H-1 (Dep. Pgs. 68, 70, 74, 111-112). Mr. Keller also testified that the deputies would
> push him around in the wheel chair outside of the H-1 and wheeled him to the recreation room
> (Dep. Pgs. 75-78).

(*Id.*)

Dr. Ross opined that Keller had adequate access to medical care while in

CCCF.   (*Id.*, PageID.412-13.)

The Court previously struck Keller's expert because Keller's expert disclosures failed to meet the requirements of Fed. R. Civ. P. 26(a)(2)(B)(i).[2]   (ECF No. 67.)

## III.   Dismissal of Chippewa County Sheriff's Department

Defendant Chippewa County Sheriff's Department argues that it should be dismissed from this case because it is not a legal entity capable of being sued.   The ADA defines "'public entity'" to include "any State or local government" and "any department, agency, . . . or other instrumentality of a State." 42 U.S.C. § 12131(1). The Supreme Court has held that this term includes state prisons.  *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (noting that the phrase "services, programs, or activities" in § 12132 includes recreational, medical, educational, and vocational prison programs).

 The proper defendant under a Title II claim is a public entity or an official acting in his or her official capacity.   *Carten v. Kent State Univ.*, 282 F.3d 391, 396–97 (6th Cir. 2002).   In the state of Michigan, "[t]he sheriff department does not exist as a separate legal entity; it is simply an agent of the county."   *Tullos v. Balk*, No. 1:18-cv-883, 2018 WL 5306906, at *2–3 (W.D. Mich. Oct. 26, 2018).

Defendants contend the Chippewa County Sheriff's Department is not a legal entity subject to suit.   Indeed, this Court has ruled that a County Sheriff's Department was not a legal entity capable of being sued.   *Hughson v. County of*

---

[2]   Keller's expert – Dr. Kennedy – opined that Keller's prosthetic leg did not constitute a security threat and that it was "not unusual" for prisoners with chronic medical issues to be allowed to keep a medication in his or her possession.   (ECF No. 49-1, PageID.181-82.)

*Antrim,* 707 F.Supp. 304, 306 (W.D. Mich. 1988).   And, in 1995, this Court explained that Michigan Sheriff's Departments, by state Constitution, are not separate legal entities from their respective Counties:

> Michigan is a jurisdiction in which the sheriff and prosecutor are constitutional officers, and there does not exist a sheriff's department or prosecutor's office. Instead the sheriff and the prosecutor are individuals, elected in accordance with constitutional mandates. Mich. Const. art. 7, § 4. Since the sheriff's department and the prosecutor's office do not exist, they obviously cannot be sued.

> The *Hughson* ruling is consistent with *Bayer v. Macomb County Sheriff,* 29 Mich.App. 171, 175, 180, 185 N.W.2d 40 (1970), where the Michigan Court of Appeals summarily concluded that the Macomb County Sheriff Department was simply an agency of the county, not a separate legal entity.

*Vine v. Cnty. of Ingham*, 884 F. Supp. 1153, 1158 (W.D. Mich. 1995).   More recently, this Court held that the St. Joseph County Sheriff Department was not a legal entity capable of being sued in a prisoner action brought under the ADA, RA, and 42 U.S.C. § 1983.   *Tullos v. Balk*, No. 1:18-cv-883, 2018 WL 5306906 (W.D. Mich. Oct. 26, 2018). [3]   Instead, in *Tullos,* Judge Maloney concluded, liberally construing the complaint, that the proper party was not the Sheriff's Department but rather the County.   *Id.* at *2.

Keller named the Chippewa County Sheriff's Department and the Chippewa County Board of Commissioners as Defendants in this case.   The Chippewa County Sherriff's Department is not an appropriate Defendant in the state of Michigan,

---

[3]   Similarly, under Ohio law, a Sheriff's Department is not a legal entity capable of being sued under the ADA or RA.   *Lake v. Board of County Commissioners of Clark County*, 2020 WL 1164778, *3 (S.D. Ohio W.D., Mar. 11, 2020).

because it can only act through the County.    Therefore, the Chippewa County Board of Commissioners is the proper Defendant, and claims against the Sheriff's Department are dismissed.

## IV.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).    The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."    *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).    The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## V.  Analysis of Keller's ADA and RA Claims

During oral argument, Keller asserted that the intent of the ADA was to require society to be blind to disabilities.    Accordingly, he asserted that Keller should have been allowed to keep his inhalers and his prosthetic leg while in custody in the jail.    Furthermore, he asserted that the jail's decision to seize these items showed

intentional discrimination.   The Court disagrees with Keller's view of the law. First, jails cannot be blind to medications that inmates have in their possession and must always be concerned about the security implications of allowing an inmate to keep any item, including prosthetic devices, that could potentially be used as a weapon by the inmate who initially had the item or another person.   Furthermore, although the Court appreciates Keller's description of the purpose of the ADA, the Court must also apply precedent, which balances the ADA's purpose against institutional imperatives, to determine whether a genuine issue of material fact exists in this case.

Title II of the ADA provides, in pertinent part, that no qualified individual with a disability shall, because of that disability, "be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   *Mingus v. Butler*, 591 F.3d 474, 481-82 (6th Cir. 2010) (citing 42 U.S.C. § 12132).   To establish a claim under Title II of the ADA, Keller must show:

> (1) that he is a qualified individual with a disability[4];
>
> (2) that defendants are subject to the ADA; and

---

[4]     The term "qualified individual with a disability" includes "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity."   42 U.S.C. § 12131(2).   It should also be noted that the parties do not dispute that Keller's COPD and amputation constitute disabilities.

(3) that he was denied the opportunity to participate in or benefit

from defendants' services, programs, or activities, or was otherwise

discriminated against by defendants, by reason of plaintiff's disability.

*Tucker v. Tennessee*, 539 F.3d 526, 532-33 (6th Cir. 2008) *overruled in part by*

*Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015)[5]; *Jones v. City of*

*Monroe*, 341 F.3d 474, 477 (6th Cir. 2003).

Similarly, Section 504 of the RA protects any "otherwise qualified individual"

from "be[ing] excluded from the participation in, be[ing] denied the benefits of, or

be[ing] subjected to discrimination" under specified programs "solely by reason of her

or his disability."   29 U.S.C. § 794(a).   An RA claim is based on the following

elements:

(1) that the plaintiff is a handicapped person under the Act;

(2) that the plaintiff is otherwise qualified for participation in a

program;

(3) that the plaintiff is being excluded from participation in, being

denied benefits of, or being subjected to discrimination under the

program solely due to a handicap; and

(4) the program or activity is receiving federal financial

assistance.

---

[5]    The third element in *Tucker* required a showing that the discrimination be
"solely" because of the disability.    *Tucker*, 539 F.3d at 535.    *Anderson* simply
removed the sole-causation requirement.    798 F.3d at 357 n. 1.

- 17 -

*Sanderson v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030-31 (6th Cir. 1995.) Given the similarity between the ADA and the RA, the claims may be analyzed together. *Thompson v. Williamson Cnty*, 219 F.3d 555, 557 (6th Cir. 2000).

For a claim of intentional discrimination under the ADA, the Court uses the familiar burden-shifting analysis established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). "Under *McDonnell Douglas,* [a] [p]laintiff must first establish a prima facie case of discrimination." *Turner v. City of Englewood,* 195 F. App'x 346, 353 (6th Cir. 2006). To establish a prima facie case of intentional discrimination under the ADA, the plaintiff must show that he has a disability, that he is otherwise qualified, and that he was "excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability." *Anderson,* 798 F.3d at 357 (footnote omitted). In establishing a prima facie case, a plaintiff must present evidence showing intentional discrimination because of his disability. *Id.* at 356-357. "In other words, the plaintiff must show that the defendant took action because of the plaintiff's disability, i.e., the '[p]laintiff must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Id.* (citing *Turner*, 195 F. App'x at 353).

After a plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to establish a legitimate, nondiscriminatory reason for the conduct taken. *Id.* (citing *Sjostrand v. Ohio State Univ.,* 750 F.3d 596, 599 (6th Cir. 2014)).

After a defendant presents a legitimate and nondiscriminatory reason for the challenged action, "one of production, not persuasion—[the plaintiff] must then present evidence allowing a jury to find that the [defendant's] explanation is a pretext for unlawful discrimination."   *Id.* (citation omitted).

Keller argues that this is "primarily a discrimination case" and characterizes the actions of Defendants as "clear discrimination."   (ECF No. 74, PageID.526.) Nevertheless, the Court recognizes two additional ways that Keller could assert liability under the ADA and RA.   Keller could allege and prove (1) a disparate-impact arising from the enforcement of the jail policies, or (2) the failure to provide a reasonable accommodation.   *Burley v. Quiroga*, No. 16-CV-10712, 2019 WL 4316499, at *3 (E.D. Mich. June 6, 2019), *report and recommendation adopted*, No. 16-CV-10712, 2019 WL 3334810 (E.D. Mich. July 25, 2019).   Keller has also asserted that the jail failed to reasonably accommodate his disabilities.

A plaintiff raising an ADA claim based on failure to provide reasonable accommodation must first establish a prima facie case of discrimination under the requirements of the ADA or RA.   *Id.* at *4.   A "deliberate refusal of prison officials to accommodate [an inmate's] disability related needs in such fundamentals as mobility, hygiene, medical care, and ... prison programs" may constitute a violation of Title II."   *United States v. Georgia,* 546 U.S. 151, 157 (2006).   Reasonable accommodations must give a disabled inmate meaningful access to the program in question.   *Alexander v. Choate,* 469 U.S. 287, 301 (1985).   Public entities must make reasonable accommodations for disabled individuals to provide them with the same

meaningful access to the benefits of the services as nondisabled individuals.  *Burley*, 2019 WL 4316499, at *4 (citing *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004)).

In *Wright* v. *New York State Department of Corrections*, 831 F.3d 64 (2d Cir. 2016), the Court of Appeals for the Second Circuit discussed the ADA concepts of "reasonable accommodation" and "meaningful access" in the prison context, stating the following:

> A reasonable accommodation must provide effective access to prison activities and programs. That is, the accommodation must overcome structural impediments and non-trivial temporal delays that limit access to programs, services, and activities. An accommodation is not plainly reasonable if it is so inadequate that it deters the plaintiff from attempting to access the services otherwise available to him.   In short, providing meaningful access requires just that — granting inmates *meaningful* participation in prison activities and programs.

*Id*. at 73 (internal citations and quotes omitted).   The court also stated that a defendant is entitled to summary judgment only if the undisputed record revealed that the plaintiff was accorded a "plainly reasonable" accommodation.   *Id*. at 73 (citation omitted).[6]

---

[6]   The plaintiff in *Wright* was confined to a wheelchair.   He challenged the mobility assistance program implemented state-wide by the New York State Department of Corrections and Community Supervision (DOCCS).   The program contained a blanket proscription on motorized wheelchairs.   *Wright*, 831 F.3d at 68. The court of appeals concluded that genuine disputes of fact remained concerning whether the program provided meaningful access to DOCCS services, and whether allowing the plaintiff to use a motorized wheelchair would amount to an undue burden to prison officials.   *Id*. at 68-69.   The Court noted that a blanket ban, without any individualized inquiry, violated the ADA and the Rehabilitation Act.   *Id*.

If the plaintiff meets the requirements of the ADA and RA and establishes a prima facie case of discrimination, "the burden shifts to the defendant to show that the accommodation provided was either effective, or that the accommodation sought and not provided would have resulted in a fundamental alteration of the procedures or an undue financial or administrative burden." *Tucker*, 539 F.3d at 532-33.   The requirements under these acts "are subject to the bounds of reasonableness. *Id.* at 532.

### A. Keller's ADA/RA Claim Based on the Seizure of his Inhalers and Meaningful Access to Treatment for his COPD

The Court must consider Defendants' seizure of Keller's inhalers and the access they subsequently provided to medical care to treat his COPD.   The Court finds that Keller has failed to present evidence establishing a genuine issue of material fact as to this aspect of his case.   First, Keller has failed to establish a prima facie case of discrimination under the ADA.   As noted above, Keller must show that he has a disability, that he is otherwise qualified, and that he was "excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability." *Anderson*, 798 F.3d at 357 (footnote omitted). Defendants concede the first two points, but present evidence showing that Keller was not excluded from participation in a CCCF program, denied the benefits of a CCCF program, or subjected to discrimination because of his disability.   The issue here is Keller's access to medical treatment in the jail.   Although Keller argues that he was denied individualized treatment, the record before the Court shows the exact opposite.   As detailed above, Keller was given a detailed medical review upon

booking.   (*See* ECF No. 71-4 (inmate questionnaire); ECF No. 71-5 (jail medical comments); ECF No. 71-6 (medical screening report); and ECF No. 71-7 (inmate alcohol/drug usage questionnaire).)   Deputy Apps consulted with the CCCF's contract physician – Dr. Dood – during the booking process to discuss the specifics of Keller's prescriptions.   (ECF No. 71-2, PageID.373.)   Keller was initially housed in holding cell H-1, which is near the control room and is equipped with an intercom allowing communications with jail staff and a telephone.   (ECF No. 71-1, PageID.368.)   And when Keller began experiencing breathing issues on January 17, the CCCF staff responded, and also consulted with Dr. Dood to address these issues, which resulted in supplemental treatments.   (ECF Nos. 71-14 (documenting additional treatment provided on January 17), 71-15, 71-10 (documenting treatment provided on January 18 by CHC).)   After Keller experienced breathing issues, jail staff moved him to observation cell O-2 for medical reasons.   (ECF No. 71-1, PageID.367.)   Furthermore, jail staff appear to have provided medication to Keller on the prescribed schedule.   (ECF No. 71-16 (medication administration record).)   And Nurse Lightfoot performed a health assessment on January 18.   (*See* ECF No. 71-10 (Correctional Health Companies (CHC) records).)   It is clear that Keller had access to the medical services offered by the CCCF.   (*See* ECF Nos. 71-1 (affidavit of Lt. Stanaway, summarizing treatment provided to Keller in the jail), 71-12, PageID.412-13 (Dr. Ross's expert report, discussing medical treatment provided to Keller.)   Indeed, Keller has provided no evidence showing that he was denied medical care.

Second, the evidence in the record fails to show a genuine issue of material fact regarding discriminatory intent.   The record before the Court shows an absence of discriminatory intent.   Keller's main contention is that the CCCF's decision to seize his medications, pursuant to jail policy (*see* ECF 71-1, PageID.366), was discriminatory.   Keller seems to misunderstand the policy.   The jail's policy, as described by Lt. Stanaway, was that *inmates* were not allowed to keep medications. (*Id.*)   A reasonable reading of Lt. Stanaway's affidavit was that this policy applied to *all inmates*, not just disabled inmates.   Keller has provided no evidence showing that the CCCF seized medications only from disabled inmates.   Thus, this policy did not specifically target disabled persons.   Furthermore, Keller has provided no evidence jail staff seized his inhalers due to animus specifically directed at him, or specifically related to his disabilities.

Third, Defendants have provided a legitimate, non-discriminatory reason for seizing Keller's inhalers.   As Lt. Stanaway explained, the jail does not allow inmates to keep medications due to the potential for overdose and sharing medication with other inmates.[7]   (ECF No. 71-1, PageID.366.) Dr. Sethi, Keller's pulmonologist, testified that a rescue inhaler (i.e., an inhaler containing Proair) could cause tachycardia and palpitations.   (ECF No. 71-19, PageID.518.)   Sethi's statement supports the jail's policy of seizing medications, or at least rescue inhalers.   Keller

---

[7]   It should be noted that jail keep-on-person (KOP) policies have led to lawsuits. *See e.g.*, *Andrews v. Wayne Cty., Michigan*, 957 F.3d 714, 717 (6th Cir. 2020) (pretrial detainee at Defendant-Appellee Wayne County's Jail was allowed to keep 45 blood pressure medication pills, and subsequently overdosed on this medication and died).

has failed to offer evidence showing that this explanation was a pretext for discrimination, as required under *McDonnell-Douglas*.   *See Anderson*, 798 F.3d at 357 (stating the *McDonnell-Douglas* burden-shifting requirements).

Fourth, the evidence in the record fails to show a genuine issue of material fact regarding Keller's meaningful access to a reasonable accommodation for his disability.   As discussed above, a plaintiff who asserts that defendants failed to provide reasonable accommodation must first make out a prima facie case showing a violation of the ADA.   Keller has failed to present evidence making out a prima face case.   Nevertheless, the Court is compelled to consider the reasonable accommodation issue in this case.   A jail always has an obligation to address an inmate's medical needs.[8]   But, access to timely medical care became essential in this case because the jail seized Keller's inhalers, including his Proair rescue inhaler. This is not a matter to be taken lightly.   Here, however, the evidence in the record shows that Keller had effective access to a reasonable accommodation to address his COPD.   Dr. Sethi, Keller's pulmonologist, testified that a person with COPD should have a rescue inhaler close to his/her person or "available with somebody around them who can bring for them . . . right away, in close vicinity."   (ECF No. 71-19, PageID.518-19.)   The evidence here indicates that Keller had ready access to jail

---

[8]     "While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment."   *Gray v. City of Detroit*, 399 F.3d 612, 615–16 (6th Cir. 2005).

staff, who had custody of his inhalers. As Lt. Stanaway stated in his affidavit, Keller was initially held in holding cell H-1, which "is located right near the control room" and had an intercom that allowed communications with the control room, and then moved to observation cell O-2 on January 17 for medical reasons. (ECF No. 71-1, PageID.367.) Lt. Stanaway's affidavit indicates that cell O-2 also had an emergency button. (*Id.*, PageID.369.) In addition, the medical records in this case show that the jail staff did respond to Keller's breathing issues. (*See* ECF Nos. 71-14 (documenting additional treatment provided on January 17), 71-15, 71-10 (documenting treatment provided on January 18 by CHC).) Furthermore, jail staff appear to have provided medication to Keller on the prescribed schedule. (ECF No. 71-16 (medication administration record).)

The Court has assessed Keller's COPD-based claim by analyzing the seizure of Keller's inhalers and the subsequent accommodation provided to address his disability. The Court concludes that the evidence in the record fails to show a genuine issue of material fact regarding the seizure of the inhalers and the accommodation provided. In summary, the evidence shows that the jail seized Keller's inhalers for a legitimate, non-discriminatory reason, and then provided effective access to a reasonable accommodation to address his COPD.

### B. Keller's ADA/RA Claim Based on the Seizure of his Prosthetic Leg and Meaningful Access to a Reasonable Accommodation for his Disability

The Court must consider Defendants' seizure of Keller's prosthetic and the access they subsequently provided to address Keller's disability. The Court finds

that Keller has failed to present evidence establishing a genuine issue of material fact as to this aspect of his case.

As an initial matter, the Court concludes that the decision to seize Keller's prosthetic leg was objectively reasonable and was not a violation of the ADA.   As noted in the statement of undisputed facts, Keller's prosthetic leg weighed 10 to 15 pounds and was made of hard plastic and metal.   (ECF No. 71-17, PageID.485-86.) Keller also said that he took off this leg four to six times per day.   (*Id.*, PageID.484.) Although Keller is a slight man, the jail also had to consider the possibility that another inmate might use this leg as club.   The Court of Appeals for the Eighth Circuit considered a similar scenario, and found that seizure of the prosthetic was reasonable:

> we believe that the decision to confiscate Sternberg's prosthetic leg was reasonable.   The prosthetic leg consisted of a mannequin-like foot, a carbon-fiber socket contoured to fit Sternberg's knee, and numerous metal parts, including two bolts near the heel, two more at the ankle, a cylindrical clamp, a receiving catch, and a stainless steel post. Constructed of hard, durable materials, the prosthetic leg was capable of supporting Sternberg's weight. Precisely because of its heavy-duty design, however, the prosthetic leg was also capable of serving as a weapon for harming others. "A detention facility is a unique place fraught with serious security dangers," and "the Government must be able to take steps to maintain security and order at the institution and make certain no weapons ... reach detainees."   Given the potential that Sternberg's prosthetic leg could be used as a dangerous weapon, the decision to confiscate his prosthetic leg was objectively reasonable, despite the intrusion on his personal privacy.   Summary judgment in favor of the county employees was therefore proper on Sternberg's Fourth Amendment claim.

*Baribeau v. City of Minneapolis*, 596 F.3d 465, 483 (8th Cir. 2010) (internal citations omitted).

Although the *Baribeau* case considered the seizure of a prosthetic leg in the context of a Fourth Amendment claim, the reasoning applies here.   Keller's leg was a potential weapon, and the jail was justified in seizing it.

The reasoning in *Baribeau* does not, however, end the inquiry here.   This is an ADA/RA case.   The real issue here is whether Keller had meaningful access to jail programs and facilities.   Defendants point out that Keller received meals, used the toilet and sink, used the intercom telephone, and was brought to the recreation area. (ECF No. 71, PageID.357.)   Defendants are certainly correct that the record supports these conclusions.   Defendants then argue that because Keller had access to the service programs and activities of the jail, that he cannot make out a prima facie case for a violation of the ADA/RA.   The Court is not willing to go this far.

In the Court's view, a disabled inmate will likely go to extreme lengths to go to the bathroom and to get food and water.   But an inmate does not lose an ADA claim simply because he is willing to go to extreme lengths to obtain the basic necessities. Thus, the layouts of the holding cell and the observation cell are important.

Keller's ADA and RA claims fail because he has not shown that he was denied meaningful access to any of the Chippewa Jail's services, programs, or activities during his three days of confinement.   The closest Keller gets to establishing this element of his prima facie case is his assertion that he had difficulty using the toilet. Keller stated during his deposition that he was told by a deputy to "hop around or

crawl." (ECF No. 71-17, PageID.492.) This is certainly a disturbing statement coming from a deputy, one that the Court cannot condone. *See Schmidt v. Odell*, 64 F. Supp. 2d. 1014, 1033 (D. Kan. 1999) (providing a double amputee knee pads for mobility, denying access to a wheelchair, and requiring the jail inmate to crawl to the shower, with limited or no access to the toilet, recreational areas, or the ability to obtain meals created a genuine issue of material fact to preclude summary judgment on the ADA claim by showing a basic denial of the benefits and services provided at the jail facility). But beyond this point, Keller provided very little information. He explained that, in the cell, he "scooted along with [his] one leg" while holding the wall. (*Id.*) He also said the holding cell had one bench, and he said the bathroom was "right there." (*Id.*, PageID.493.) Keller said that he was able to use the sink and toilet in the holding cell. (*Id.*, PageID.492-93.) He also said he "shuffled" to get to the sink and toilet. (*Id.*, PageID.493.) But Keller provided no other information on the nature of the cells. He did not describe the layout of the cells, the location of the toilet, the distance he needed to travel to use the toilet, or whether handrails or assistive devices were present. [9] Keller provides no evidence explaining any difficulty that he experienced in moving around his jail cells.

---

[9] During argument Plaintiff's counsel made a statement that the cells were not ADA compliant. Defense counsel responded that the claim the cells are not ADA compliant is false. Nevertheless, the Court cannot accept counsels' statements as fact. It is Plaintiff's obligation to support his claims with factual evidence. The Court has no idea whether the jail cells are ADA compliant or not. This is because the record is silent as to this issue, and Plaintiff undertook virtually no pretrial discovery in this case. Moreover, Plaintiff made no effort to develop an argument concerning whether the jail was ADA compliant or to provide the Court with any evidence concerning the layout of the jail or jail cells, such as diagrams or

The lack of evidence in the record is significant.   On the scant record here, the Court concludes that Keller failed to satisfy his burden showing a genuine issue of fact regarding whether he was denied any benefits of programs or services available at the jail because of his disability.   There simply is no evidence in the record that Keller was denied any program or service due to his disability or the jail's failure to reasonably accommodate his disability.   The Court needs some evidence that could potentially create a genuine issue of fact on this issue to rule in Keller's favor on this motion.   The failure to support his claims with admissible evidence is fatal to Keller's ADA and RA claims.

In addition, the Court concludes that Keller has failed to provide evidence showing animus against him or evidence showing that he was discriminated against on the basis of his disabilities.   Defendants provided two legitimate, non-discriminatory reasons for their decision to seize Keller's prosthetic leg: "Plaintiff had a sore on his left leg and the prosthetic could be used as a weapon to harm others." (ECF No. 71-1, PageID.367.)   Keller has failed to offer evidence showing that this explanation was a pretext for discrimination, as required under *McDonnell-Douglas*. *See Anderson*, 798 F.3d at 357 (stating the *McDonnell-Douglas* burden-shifting requirements).

---

photographs, or even an affidavit.   This is due, at least in part, to the likelihood that this was never the claim that Plaintiff intended to assert.   Keller seems to focus only on the fact that his prosthetic leg and inhalers were taken from him.   But that fact alone is not enough to establish his prima facie burden under the ADA or RA.

## VI.   Conclusion

The Court understands that Keller's three-day incarceration in the Chippewa County Jail was not a pleasant or comfortable experience.   The Court is aware that Keller lost part of his left leg and has pulmonary issues that will not improve.   The Court is sympathetic to Keller's medical condition and concerns.

Keller, however, failed to present evidence to establish a genuine issue of material fact regarding his ADA and RA claims.   The evidence before the Court establishes legitimate, non-discriminatory reasons for the jail to seize Keller's prosthetic leg and his inhalers.   The evidence also shows that the jail provided reasonable accommodations to address Keller's disabilities.   Keller has not presented countervailing evidence on these points that creates a genuine issue of material fact.

For these reasons, Defendants' motion for summary judgment is respectfully GRANTED and this case is dismissed.

Dated:    October 7, 2020                        /s/ *Maarten Vermaat*
                                                 MAARTEN VERMAAT
                                                 U.S. MAGISTRATE JUDGE